# EXHIBIT B

Brett Schreiber, Esq. (SBN 239707)
Meagan Verschueren, Esq. (SBN 313117)
Katie Llamas, Esq. (SBN 303983)
Kristina Aiad-Toss (*pro hac vice forthcoming)*
Singleton Schreiber, LLP
591 Camino de la Reina, Ste. 1025
San Diego, California 92108
Tel: (619) 771-3473
bschreiber@singletonschreiber.com
mverschueren@singletonschreiber.com
kllamas@singletonschreiber.com
ktoss@singletonschreiber.com

Attorneys for Plaintiff

**Electronically FILED by Superior Court of California, County of Los Angeles 9/24/2025 1:42 PM David W. Slayton, Executive Officer/Clerk of Court, By L. Kulkin, Deputy Clerk**

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

DEONTE NASH,

Plaintiff,

v.

SEAN COMBS; 207 ANDERSON; BAD BOY ENTERTAINMENT, LLC; CE OPCO, LLC d/b/a COMBS GLOBAL, f/k/a COMBS ENTERPRISES, LLC; JANICE COMBS PUBLISHING, LLC; BAD BOY RECORDS, LLC; BAD BOY ENTERTAINMENT HOLDINGS, INC; and DOES 1 through 25, inclusive.

Defendants.

Case No.: 25SMCV05112

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1. **HUMAN TRAFFICKING CALIFORNIA CIVIL CODE § 52.5**
2. **ASSAULT**
3. **BATTERY**
4. **SEXUAL BATTERY**
5. **NEGLIGENCE**
6. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
7. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
8. **FALSE IMPRISONMENT**
9. **GENDER VIOLENCE UNDER CAL. CIVIL CODE §52.4**
10. **SEXUAL ORIENTATION VIOLENCE UNDER CAL. CIVIL CODE §52.4**
11. **CONSTRUCTIVE DISCHARGE**

Plaintiff DEONTE NASH, an individual, brings this action against Defendants SEAN COMBS; 207 ANDERSON, LLC; BAD BOY ENTERTAINMENT, LLC; BAD BOY RECORDS, LLC; and CE OPCO, LLC d/b/a COMBS GLOBAL, f/k/a COMBS ENTERPRISES, LLC;

JANICE COMBS PUBLISHING, LLC; BAD BOY ENTERTAINMENT HOLDINGS, INC; and DOES 1 through 25, inclusive (collectively, "Defendants") to recover for his personal injuries.

**PRELIMINARY STATEMENT**

1. Plaintiff Deonte Nash grew up dreaming of a career in the entertainment industry. At the young age of twenty-one, hard work and dedication led him to a position as a stylist to one of the world's most well-known rappers and record executives: Diddy or Defendant Sean Combs ("Combs").

2. Combs came to fame in the early 1990s with his record label Bad Boy Records. He rose to prominence in the music and entertainment industry over the decades and was regularly referred to as a hip-hop mogul.

3. From the outside looking in, Mr. Nash achieved his childhood dream by becoming a stylist for one of the most famous and powerful men in the entertainment industry. That could not be further from the truth. Instead, Combs acting through Defendants turned Mr. Nash's dream into a nightmare that he was forced to endure nearly every single day of his approximately ten years of employment. And the horrors Mr. Nash experienced continue to plague him even after his employment ended.

4. Combs, acting through Defendants' employment relationship with Mr. Nash, subjected Mr. Nash to a decade of sexual and physical assault, sexual and verbal harassment, trafficking, degradation and humiliation, threats to his life and well-being, stalking, control, and psychological manipulation. Combs used his power and threats of harm to compel Mr. Nash to do his bidding and prevent him from leaving Defendants' control. Even after his employment ended, threats continued, and Mr. Nash has not felt safe, even to this day.

5. Though Defendants have silenced him for years, Mr. Nash is no longer willing to give in to this fear for his life and is now standing up to demand justice.

**PARTIES**

6. Plaintiff Deonte Nash is a resident of the State of California, County of Los Angeles, and, from 2007 to 2018, was employed by Defendants Sean Combs; 207 Anderson, LLC; Bad Boy Entertainment, LLC; Bad Boy Entertainment Holdings, Inc; Bad Boy Records, LLC; Janice Combs

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

Publishing, LLC; and CE Opco, LLC d/b/a Combs Global, f/k/a Combs Enterprises, LLC and Does 1-25.

7. Defendant Sean Combs is an individual who, on information and belief, is a citizen and permanent resident of the State of Florida. Currently, Combs is incarcerated in the Federal Detention Center in Brooklyn, New York. He has been housed there since September 2024.

a. On information and belief, at all times, Combs owned and/or controlled 207 Anderson, LLC; Bad Boy Entertainment, LLC; Bad Boy Entertainment Holdings, Inc; Bad Boy Records, LLC; Janice Combs Publishing, LLC; CE Opco, LLC. d/b/a Combs Global, f/k/a Combs Enterprises, LLC; and Does 1-25. These entity Defendants will collectively be referred to as "Combs Enterprises". Upon information and belief, these Defendants are part of Combs Enterprises and the alter ego of Defendant Combs. At all relevant times herein, Defendant Combs met the definition of an "employer" of Plaintiff under all relevant statutes.

8. Plaintiff is informed, believes, and alleges that Defendant 207 Anderson, LLC was at all times relevant, a limited liability company conducting business in the County of Los Angeles, State of California. Upon information and belief, Defendant 207 Anderson, LLC served as the record employer for payroll purposes during Plaintiff's employment in the County of Los Angeles, State of California. Combs was the Chief Executive Officer of 207 Anderson, LLC.

9. As part of Combs' Bad Boy record label and brand, which is part of Combs Enterprises (or vice versa), Combs has established several corporate entities under the "Bad Boy" name over the last few decades, including but not limited to Bad Boy Entertainment Holdings, Inc; Bad Boy Entertainment, LLC; and Bad Boy Records, LLC. Bad Boy Entertainment, LLC; Bad Boy Entertainment Holdings, Inc; and Bad Boy Records, LLC will collectively be referred to as "Bad Boy Entities".

10. Defendant Bad Boy Entertainment Holdings, Inc is a domestic corporation incorporated in New York. On information and belief its principal place of business is 9255 Sunset Boulevard, 2nd floor, West Hollywood, CA, 90069. Bad Boy Entertainment Holdings, Inc is part of the Bad Boy Entities founded and owned by Combs and on information and belief is now owned and/or controlled by Combs and/or Combs Global. Combs is listed as the CEO at the address 1710

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

Broadway, New York, NY 10019.

11. Defendant Bad Boy Entertainment, LLC is a New York limited liability company that is headquartered in New York and/or California. Bad Boy Entertainment, LLC is a music, media, and entertainment company founded by Combs. Bad Boy Entertainment, LLC is part of the Bad Boy Entities and/or successor-in-interest to the other Bad Boy Defendants that were founded and were/are owned/controlled by Combs and/or Combs Enterprises.

12. Defendant Bad Boy Records, LLC is a Delaware limited liability company with its principal place of business located in New York, New York. Bad Boy Records, LLC is part of the Bad Boy Entities and/or successor-in-interest to the other Bad Boy Defendants that were founded and were/are owned/controlled by Combs and/or Combs Enterprises.

13. Upon information and belief, all active Bad Boy entities are owned and/or controlled by Combs and/or Combs Global and were all part of Combs Enterprises.

14. Defendant Janice Combs Publishing, LLC is a domestic limited liability company incorporated in New York with a principal place of business in New York.

15. Defendant CE OPCO, LLC. d/b/a Combs Global, f/k/a Combs Enterprises, LLC. ("Combs Global") is a limited liability company incorporated in Delaware with a principal place of business at 9255 Sunset Blvd, 2nd floor, West Hollywood, CA 90069. This Defendant is the alter ego of Sean Combs. In February 2023, Combs publicly announced that Combs Global was rebranding from Combs Enterprises, LLC. Combs Global owns the trademark "Sean Puffy Combs" which was launched by Sean Combs in 2020.

16. Upon information and belief, all owners of Combs Global are citizens of California and performed work in the County of Los Angeles.

17. The true names and capacities, whether individual, business entity or otherwise of the Defendants sued herein as Does 1 through 25, inclusive are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the Defendants herein designated as a Doe is negligently responsible in some manner for the events and happenings alleged herein and legally caused the injuries and damages alleged below. Plaintiff will amend the Complaint to allege the true names and capacities when ascertained.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

18. As part of his renowned Bad Boy record label and brand which is part of Combs Enterprises or vice versa, Combs has established several corporate entities under the "Bad Boy" and "Combs" names over the past few decades, including but not limited to 207 Anderson, LLC; Bad Boy Entertainment, LLC; Bad Boy Records, LLC; And Ce Opco, LLC D/B/A Combs Global, F/K/A Combs Enterprises, LLC; Janice Combs Publishing, LLC; Bad Boy Entertainment Holdings, Inc.

19. On information and belief, all Bad Boy corporate entities are alter egos for Combs, are controlled and/or directed by Combs, and/or were established or used by Combs for the purpose of moving, disposing of, and/or insulating his assets, including in connection with his criminal and civil activities and to avoid liability.

20. All actions taken by Combs are imputed to all Defendants, where reference is made to Combs reference is to all Defendants as Combs was acting in the scope of the employment relationship as to all Defendants.

21. Defendants, and each of them, committed the wrongful acts alleged herein independently and by and through their employees, agents, and/or independent contractors acting within the course and scope of his or her employment and/or agency with Defendants and Defendants are therefore vicariously liable for the acts of each of their employees, agents, and/or independent contractors.

22. Upon information and belief, at all times mentioned herein, all Defendants, whether DOES or specifically named and/or designated herein were the agents, principles, employees, employers, representatives, joint venture or conspirators, management companies and/or representatives, or alter ego of each of the other defendants and Does, either actually or ostensibly, and in doing the things alleged herein acted within the course and scope of such agency, employment, joint venture, conspiracy, management company agreement, alter ego agreement and/or service with the approval, knowledge, authority, acquiescence and/or ratification of each of the remaining defendants and Does.

23. All of the acts and conduct herein and below described were duly authorized, ordered, and directed by the respective and collective Defendant corporate employers, and the

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

directors, officers and management-level employees of said corporate employers. In addition, said corporate employers participated in the acts and conduct of their said employees, agents, and representatives, and each of them; and upon completion of said acts and conduct of said corporate employees, agents, and representatives, the defendant corporation respectively and collectively ratified, accepted the benefits of, condoned, alluded, acquiesced, authorized and otherwise approved of each and all of the said acts and conduct of the corporate employees, agents, and representatives.

24. In addition, each of the Defendants was at all times acting as the agent, servant, employee or independent contractor of the remaining Defendants, and was doing so at the behest of and with the approval of those Defendants.

25. At all times herein relevant, Plaintiff Deonte Nash reasonably and without negligence relied on those representations made by the Defendants about the agency, service, or employment of each of the remaining Defendants.

26. Wherever appearing in this Complaint, each reference to Defendants shall be deemed to include all named Defendants as well as all fictitiously named Defendants.

**<u>JURISDICTION AND VENUE</u>**

27. Jurisdiction and venue are proper in this subject Court and County because at least two Defendants have their principal place of business in the County of Los Angeles and a substantial amount of the events took place in the County of Los Angeles, State of California.

28. All named defendants do business and conduct continuous and systemic activities in the County of Los Angeles, State of California.

29. The amount in controversy far exceeds the jurisdictional limits.

**<u>FACTUAL ALLEGATIONS</u>**

30. Sean Combs is one of the most famous and powerful music producers in the world. He founded and heads or headed the Bad Boy record label and controls several powerful entities in the entertainment industry.

31. For years, Combs excelled at maintaining a public image as a caring, religious, successful musician, producer, role model, and father. Others with power and influence looked up

to Combs. New York City Mayor Eric Adams gave Combs a key to the City. Howard University awarded Combs an honorary degree and established a scholarship program in his name.

32. But for more than a decade, Combs successfully concealed a dark world from the public in which he exerted power and control over vulnerable men and women, forcing them to engage in acts—including sexual acts and acts of violence—against their will. When his power and control did not work, Combs resorted to physical violence and threats to control and silence his victims.

33. Sadly, Plaintiff is all too familiar with the realities of Combs' aggression, threats, violence, and control because he is a victim and survivor.

34. Plaintiff is an African American man who identifies as gay. Mr. Nash works as a stylist and creative director in the entertainment industry.

35. Mr. Nash dreamed of working in the entertainment industry since he was a child.

36. After moving to New York City, Mr. Nash started working for Defendants as a stylist intern in approximately 2008 at the young age of twenty-one. In addition to being a stylist for Combs, Mr. Nash also worked primarily as a stylist and creative director for Casandra ("Cassie") Ventura ("Ms. Ventura"), Defendants' employee and Defendant Combs' former girlfriend.

37. After a few months, Mr. Nash's hard work paid off and Defendants hired him as an employee. He was misclassified as a 1099 employee. It was at this time that Mr. Nash started working well over forty (40) hours per week. For many years, most weeks he was forced to work unpaid overtime for Defendants and their associated entertainers. Defendants rejected Mr. Nash's invoices for the extra work he performed.

38. From approximately 2008 to 2018, Defendant Combs had a ten-year relationship with Casandra Ventura. Mr. Nash, being Ms. Ventura's stylist and Defendants' employee during that time period, witnessed many heinous incidents first-hand as alleged in greater detail below.

39. Because Mr. Nash and Ms. Ventura spent so much time together they quickly became close friends. They were bonded by the trauma they experienced at the hands of Defendants as alleged throughout this complaint.

40. Moreover, Mr. Nash personally experienced sexual, physical, mental, and emotional

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

abuse at the hands of Defendants during his ten-year employment. As discussed in the allegations below, Mr. Nash endured constant unreasonable demands and expectations, forced tests of loyalty and manipulation, sexual harassment and sexual assaults, physical violence and manhandling, labor trafficking, threats of harm, and threats of death. Ultimately, Mr. Nash had no other choice but to leave Defendants' employment in approximately 2018. But this was unavailing, Defendants continued to threaten Mr. Nash after his employment ended, causing Mr. Nash significant fear and duress and preventing him from pursuing any legal remedies against Defendants.

41. After Ms. Ventura showed extreme bravery in speaking out against Combs in a civil lawsuit, Combs' physical, emotional, and phycological abuse of his employees and others finally came to light.

42. Combs was prosecuted in a criminal trial for some of his heinous acts against Ms. Ventura and many others. This involved ongoing, long-term physical and psychological abuse carried out by Combs in his individual capacity and in his capacity as CEO and/or owners of all other Defendants. The public trial revealed that Combs was involved in abusive illegal conduct, including sexual abuse, for at least a decade.

43. Specifically, Ms. Ventura described a secret world of forced drug-fueled orgies that lasted days. Ms. Ventura revealed that Combs forced her to participate in degrading and harmful sexual acts and described how these experiences took a significant toll on her physical and mental health.

44. Ms. Ventura provided specific examples of physical violence during her testimony at Combs' criminal trial, including incidents where she suffered black eyes, cuts requiring stitches, and other serious injuries.

45. Mr. Nash was served a subpoena and forced to testify at Combs' criminal trial where he, too, described under oath certain specific examples of Combs' sexual and physical violence towards others. Mr. Nash also described how Combs exerted his power and influence to intimidate, threaten, and manipulate Mr. Nash and others.

46. Combs was able to engage in such conduct for so long without detection because he used his power in the entertainment industry and as the head of Bad Boy records to silence his

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

victims. Moreover, on information and belief, executives and other agents of Combs' companies (Defendants) were involved in Combs' illegal activities and actively worked to conceal them.

**A. Defendant Combs Sexually Assaulted Mr. Nash.**

47. Mr. Nash was sexually assaulted by Defendant Combs on multiple occasions during the decade he was employed by Defendants. Below is only a glimpse into the pervasive sexual abuse that Mr. Nash endured at the hands of Combs.

48. In approximately 2013 or 2014, during a party at Combs' glass house, Combs pulled his pants down and exposed his penis to Mr. Nash while at least two other employees were present. Combs moved closer to Mr. Nash with his penis out. Mr. Nash told Combs to stop. Mr. Nash told him something to the effect of, "Girl, what are you doing? Go away." Combs pulled his pants up, laughed, and walked away.

49. In Vegas in 2015, Combs entered a bathroom, without permission, while Mr. Nash was changing his shirt. Combs pinched Mr. Nash's nipple without his consent and made comments comparing Mr. Nash's body with another male.

50. In August 2016, Mr. Nash and Ms. Ventura were taking photos when Combs approached wearing only underwear and sticking his tongue out in a sexual manner. Combs proceeded to forcibly grab Mr. Nash's hand and place it on his penis while laughing. Mr. Nash pushed Combs off and told him to "go away." Mr. Nash attempted to walk out of the room, but Combs groped Mr. Nash's butt and stuck his tongue out once again, in a sexual manner.

51. At a Bad Boy Reunion Tour Party in Los Angeles in 2017, Combs grabbed Mr. Nash's butt without his consent and said, "You need to be out there slangin' that dick baby." Mr. Nash jumped and was in shock because he felt Combs' fingers squeeze his butt. Mr. Nash could feel Combs' finger in the crack of his butt.

52. In 2018, while working for Defendants, preparing Combs and Ms. Ventura for a fitting at a townhouse in New York City, Combs grinded on Mr. Nash's genital area in a sexually charged way without his consent and said, "this is how I make love to my lady." Mr. Nash felt very uncomfortable because he could feel Combs' penis through his shorts. Mr. Nash felt violated and offended by this unwanted sexual touching and the inappropriate comments.

53. Combs grabbed Mr. Nash's butt without his consent at a New Years Eve Party in Miami in 2018. During this encounter, Combs told Mr. Nash he should be having sex with another man.

54. Combs sexually assaulted Mr. Nash in this manner over and over for more than a decade.

**B. Combs Sexually Harassed and Verbally Degraded Mr. Nash.**

55. From approximately 2008 to 2018, Combs also consistently made unwanted, inappropriate, sexually charged comments to Mr. Nash and Ms. Ventura despite multiple requests that he stop. Below are examples of some of that constant abuse.

56. Combs was obsessed with Mr. Nash's homosexuality and brought it up constantly, including in front of Combs' friends and colleagues. Combs' obsession made Mr. Nash feel objectified, uncomfortable, and as if Combs did not take him and his work seriously.

57. Degrading comments about Mr. Nash's homosexuality were a way Combs manipulated and controlled him. He used it as a sword in attempt to demean or belittle Mr. Nash as if being gay was something that Mr. Nash should be ashamed of—or that Mr. Nash was inferior because Mr. Nash did not conceal his sexuality.

58. Combs frequently made inappropriate and harassing comments related to Mr. Nash's sexuality, including asking if Mr. Nash was a "top" or "bottom" and repeatedly asking if Mr. Nash would "take it in the ass."

59. Combs often would gyrate his hips and make sexual innuendos in Mr. Nash's presence. These actions were directed toward Mr. Nash and made him feel violated and very uncomfortable. During these acts, Combs would often talk about the size of Mr. Nash's and other staff members penises.

60. In or about 2009, at a Cîroc Vodka commercial shoot in Los Angeles, Combs became irate and began berating Mr. Nash and another employee. While loudly yelling at Mr. Nash, Combs called him a "faggot."

61. Combs once again called Mr. Nash a "faggot" during the international portion of Combs' Dirty Money Tour in London in 2010. Combs physically charged at Mr. Nash because

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

someone had forgotten his bowtie. While charging at him, Combs mumbled and called him a "faggot" while verbally attacking him. Mr. Nash reasonably believed Combs would physically attack him. Mr. Nash tried to leave but another employee of Combs convinced him to stay. Because of this incident, Mr. Nash eventually left London early. He left despite his fear of retaliation.

62. During the domestic Dirty Money Tour in Chicago, Mr. Nash was styling two other employees of Defendants. Combs became angry with Mr. Nash because he was not giving him enough attention and called Mr. Nash a "faggot" once again.

63. These events where Combs verbally harassed, mentally abused, and degraded Mr. Nash were regular occurrences while he worked for Defendants from approximately 2008 to 2018. Even after employment, Defendants continued their threats and fear-mongering. Defendants all worked together to protect Combs, encouraged, and ratified his conduct. Defendants all conspired to and did engage in constant cover-up attempts related to the ongoing and pervasive abuse and threats with the intent to protect Combs and prevent survivors from speaking out, including Mr. Nash.

64. Oftentimes, during and after Mr. Nash's employment, Combs would find out where Mr. Nash and Ms. Ventura were and show up at their location. It didn't matter if they were at a hotel, restaurant, photoshoot, studio, or one of their homes, he would show up angry, threaten them, and make a scene. Combs would have at least one security guard with him at all times and a driver—both of whom assisted Combs in this conduct and worked to protect Combs from accountability or consequences.

65. As a result of the actions of Combs, Mr. Nash was humiliated in front of many of his colleagues.

**C. Combs Physically Abused Mr. Nash and Mr. Nash Witnessed Violence Firsthand.**

66. Combs became physically violent with Mr. Nash on several occasions. In addition to the physical assaults, Combs frequently reminded Mr. Nash of his ability to seriously harm Mr. Nash, whether by brutally beating up others in front of Mr. Nash or by reminding Plaintiff of his violent threats and follow-through.

67. Combs constantly used words and phrases that were intended to (and did)

communicate to Mr. Nash that was only alive because Combs allowed it. Combs would tell Mr. Nash that he was letting him live and other phrases that caused Mr. Nash to have significant fear and duress.

68. In approximately 2013 or 2014, Combs became upset with Mr. Nash when he found out that he and Ms. Ventura had gone out to dinner the night before. Combs went to Ms. Ventura's music video set and as Mr. Nash was standing outside near a car, threw him up onto the car and violently strangled him.

69. In 2014, at a Golden Globes after party, Combs became extremely angry and hostile because Mr. Ventura's hair was down when he'd told Mr. Nash and other employees that he wanted it up. Combs got in Mr. Nash's face, grabbed him by the shirt, and aggressively lifted him off the ground. Mr. Nash had to find hair pins from strangers to ensure Ms. Ventura's hair was put up. Combs did not calm down until Ms. Ventura had her hair put up, at which point he commented: "Oh it looked better down anyways."

70. In 2014, during one of Combs' outbursts while at Ms. Ventura's apartment in Los Angeles, Mr. Nash attempted to run away, but Combs stopped him, grabbed him, and physically assaulted him. Ms. Ventura was so scared that she attempted to climb over and out of a window to get away. Combs slapped Mr. Nash in the back of the head and violently pushed him out of the apartment. Other employees of Defendants were present. Combs' security blocked Mr. Nash and grabbed him to stop him from leaving Ms. Ventura's apartment. When Mr. Nash was finally allowed to leave, Combs and his security guards chased Mr. Nash on the freeway in his vehicle. During this incident, Combs' driver was driving Combs and his security guard. They chased Mr. Nash at nearly 100 miles per hour. Mr. Nash had to turn off his lights to try to lose them. Mr. Nash was terrified. He could not go to the police because he truly believed that would be a death sentence. At one point, Combs and his security guard entered Mr. Nash's home without permission and confiscated Mr. Nash's keys and phone while they forcibly searched the house for Ms. Ventura. Mr. Nash was then forced by Combs to go to the Le Montrose hotel to try to get Ms. Ventura out of her room.

71. In January 2016, while Combs and Ms. Ventura were broken up, Combs suspected

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

that Ms. Ventura was dating an A-list actor and became extremely upset. Combs told Mr. Nash that he was going to kill him and Ms. Ventura. Combs also started calling the actor's friends and colleagues. Mr. Nash and Ms. Ventura became so frightened for their safety that they hid out at the Bel Air Hotel for almost a week. When Mr. Nash refused to tell Combs their location, Combs threatened them, yelling: "I'm gonna have your faggot ass gang raped by some niggas if you don't fucking tell me where you are bitch. Y'all gonna stop fucking with me. I'm trying to be nice. Y'all gonna make me fuck y'all up." Mr. Nash and Ms. Ventura remained in hiding until Combs calmed down and said he was not going to kill or physically harm them.

72. In March 2013 at Ms. Ventura's apartment, Mr. Nash witnessed Combs slamming Ms. Ventura's head into a bed frame. Combs continued to kick and hit Ms. Ventura as she was bleeding. Mr. Nash tried to intervene in the attack by jumping on Combs' back. This did nothing to deter Combs, who continued to beat and attack Ms. Ventura. Combs then violently and severely strangled Mr. Nash. At one point, Mr. Nash attempted to call the police, but Combs told him to hang up in a way that compelled Mr. Nash to imminently fear for his life. He believed that if he did not hang up, Combs would kill him. So, out of fear for his life, Mr. Nash hung up.

73. This was one of many incidents when Mr. Nash was afraid that Combs would and could kill him and/or his friends. Combs bragged about violently retaliating against people that had turned against him in the past. Mr. Nash reasonably believed that he would be no different. Because of the numerous violent, unprovoked acts that Mr. Nash frequently witnessed Combs undertake, Mr. Nash reasonably feared for his life and reasonably believed that Combs would and could seriously hurt and kill him if Mr. Nash did not act as Combs instructed.

74. Mr. Nash remembers Combs kicking Ms. Ventura's door off the hinges on multiple occasions. Combs would get angry and destroy property so often that Defendants' handyman would regularly come through and repair any property damage caused by Combs. This was just another reason why Mr. Nash was so fearful of Combs.

75. Combs threatened Mr. Nash by constantly telling him, "you know how I get", "don't make me act crazy." Mr. Nash interpreted these as legitimate threats to his life and his career.

76. In approximately 2011 or 2012, one of Mr. Nash's female coworkers left

Defendants' employment, which angered Combs. Combs repeatedly called Mr. Nash to obtain her address. Combs made threats to Mr. Nash's safety if he did not provide the address. These constant and harassing calls went on for multiple days at a time. Mr. Nash remembers Combs threatened to "have some niggas shake up her bushes." Based on Combs' prior threats and behavior, Mr. Nash understood this to mean Combs was going to have men physically harm this female ex-employee.

77. Mr. Nash reasonably believed Combs blew up musician, Scott Mescudi's (Kid Cudi) car in February 2012. Mr. Nash was even more terrified for his and his friends' safety after the incident. Combs frequently referenced this incident in fights with Mr. Nash and other employees and used it as a way to force Mr. Nash and others to do his bidding. Combs would say things like, "Remember what I did to that other nigga and his shit." Mr. Nash therefore reasonably understood that Combs would and did follow through on his threats of violence.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**D. Combs Exerted Improper Control Over Mr. Nash's Career and Personal Life.**

78. Over the years that Combs abused Mr. Nash physically, sexually, psychologically, and emotionally, Mr. Nash repeatedly tried to escape his tight hold over his everyday life. Every time he hid, Combs' vast network of corporations and affiliated entities found him, and those who worked for Combs' companies scared, coerced and implored him to return to him. Many explicitly stated that his failure to return to Combs would hinder his success in the entertainment industry. They made him believe it would be career ending. Based on Combs' reputation, threats, and actions, Mr. Nash believed his life and well-being were dependent upon staying employed and controlled by Combs and Defendants, for years. Based on Combs' reputation and history, Mr. Nash believed there would be severe violent repercussions if he left.

79. Though Mr. Nash was purportedly a 1099 employee free to perform work for others, at all relevant times Combs controlled who (other than Defendants' associates) Mr. Nash could accept as clients.

80. For example, Combs told Mr. Nash and another employee of Defendants, Derek Roche, that they were not allowed to work with others in the entertainment industry and implied that Mr. Nash would have "problems" if he did. Based on his experience with and understanding of Combs and his violent tendencies, Mr. Nash understood this to be a threat to his safety and

professional career if he did not comply.

81. On one occasion, Mr. Nash was working with an A-list rapper for an awards show but because of Combs' constant demands to work for him and the other Defendants as well as threats he lost her as a client.

82. Combs and Defendants made clear that they only wanted Mr. Nash and his colleague, Derek Roche to work for him and his companies. Combs made clear that he had control over who Mr. Nash worked for "or else." Missing out on other career opportunities negatively impacted Mr. Nash's career growth.

83. When Combs suspected that Mr. Nash and his colleague, Derek Roche, were working jobs for employers other than Defendants, Combs would deliberately assign Nash and Roche busy work designed to consume their time and energy. The tasks were often unnecessary but pulled Nash away from paying clients, damaged his professional opportunities, and kept him under Defendants' employment and control. This is yet another example of how Combs and Defendants controlled Mr. Nash. Based on Combs' violent history and controlling behaviors, Mr. Nash was afraid to tell Combs no.

84. Mr. Nash was afraid to attend business meetings and events to seek other career opportunities because if Combs discovered he would retaliate by causing physical harm and reputational damage to Mr. Nash. Mr. Nash's friends and other clients would have to call ahead to places to ensure Combs would not be present, otherwise Mr. Nash would not even consider going because he was too afraid. Networking is an essential part of Mr. Nash's job and he was unable to fully do this for so long.

85. Similarly, those in the entertainment industry were hesitant to hire Mr. Nash because they feared Combs' power and influence. Other potential clients in the industry told Mr. Nash and a colleague that they wanted to work with them but were not trying "to cross Puff." Mr. Nash reasonably believed, based on Combs' words and conduct, that he would face severe harm and damage to his reputation if he ever left Defendants' employment. With his safety and livelihood on the line, Mr. Nash felt stuck and lived in fear for years. In this manner, Combs exerted unlawful influence and control over him.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

86. Combs repeatedly had Mr. Nash and Ms. Ventura followed. He called them incessantly to monitor their activities. Combs oftentimes just showed up to wherever Mr. Nash and Ms. Ventura were. He would yell at them, threaten them, and cause a scene in front of everyone, which was always humiliating and extremely stressful and scary for Mr. Nash.

87. On numerous occasions, Combs prevented Mr. Nash from leaving by taking his phone and/or keys. He would threaten Mr. Nash and take his necessities to keep him where he wanted him.

88. Combs exerted control over Mr. Nash and Ms. Ventura's whereabouts and threatened to harm them if they did not tell him their locations at all times. In that Combs was always able to locate them, Mr. Nash believed Combs was unlawfully tracking Plaintiff and Ms. Ventura.

89. On January 3, 2019, even after Mr. Nash stopped working for Defendants, Combs called Mr. Nash while he was with Ms. Ventura. Combs threatened to track Ms. Ventura's car, to find him and Ms. Ventura because Mr. Nash refused to put Ms. Ventura on the phone with Combs.

90. Combs also used Mr. Nash's race to control him by saying Mr. Nash was not meeting the standards of "black excellence" when Mr. Nash was not following Combs' orders.

91. For example, after Mr. Nash's employment ended, Combs continued with the angry outbursts and threats. On one occasion he called Mr. Nash and yelled something to the effect of, "You're not in 'black excellence' anymore. I'm going to tell everyone you don't fuck with black 'excellence' no more." On this same occasion, Combs then escalated by attempting to extort $50,000 from Mr. Nash and Ms. Ventura for money he claimed was owed to him. Combs told them, "I don't care if y'all call the feds." He made it very clear that they owed him money and that he did not care if they got law enforcement involved because he was going to get his money no matter what. Combs would continue to hold this $50,000 over Mr. Nash's head anytime he got angry with him.

92. Mr. Nash was so afraid of Combs that he kept a "go" bag ready in case he had to go into hiding. For that same reason, Mr. Nash kept cash on him at all times so that, at a moment's notice, he could go into hiding and pay for a hotel with cash such that Combs could not track him

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

via credit card.

93. On one occasion Mr. Nash escaped an angry outburst from Combs when he began to blame Mr. Nash for Ms. Ventura's leaving him during the Revolt Music Conference. Combs threatened to harm Mr. Nash and the only way for Mr. Nash to stay safe from Combs was to hide at Claire Sulmers' hotel and sneak out of Miami to avoid harm.

94. Mr. Nash and Ms. Ventura ran away from and hid from Combs many times, but each time Combs would either find them or force them to come back by threatening their safety and reputation.

95. Combs also used a bait and switch strategy to control Mr. Nash and others. For example, Mr. Nash remembers occasions when Combs would be smiling on camera and then immediately turn around and harass Mr. Nash. Mr. Nash recalls Combs' demeanor changing from calm, nice, and caring to angry, threatening, and abusive throughout each day. Combs employed these bait and switch tactics to keep Mr. Nash in a constant state of fear and uncertainty. Mr. Nash was constantly afraid Combs would become angry or violent at any time. Mr. Nash felt like he was constantly walking on eggshells.

96. Combs assigned Mr. Nash and Ms. Ventura work projects and then would drop or threaten to drop the projects when Mr. Nash and Ms. Ventura did not meet Combs' every demand. This was a threat to his career growth. Combs would use career opportunities as coercion, to control and manipulate Mr. Nash.

97. Combs constantly threatened violence, saying "you know how I get" whenever anyone did not follow his orders. Combs would use these threats against Mr. Nash and other employees of Defendants. Mr. Nash and other employees knew of Combs' anger and reputation for following through on violent threats. They did not doubt that Combs could and would hurt them.

98. To keep Mr. Nash in a constant state of fear for his safety, Combs would consistently make threats like "I'll always have you looking over your shoulder for the rest of your life," or "I'm going to make sure yall niggaz never forget me."

99. Combs claimed money was owed to him when Mr. Nash and others didn't follow his demands. Combs attempted to use this to manipulate Mr. Nash to follow orders and as a threat

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

by extorting and threatening when he didn't get his way.

100. Combs used these along with other coercive tactics to force Mr. Nash to perform tasks against his will. Combs would constantly remind Mr. Nash and other employees of the power he had over them and others in the industry to retain control over them.

101. For example, in approximately 2012, Combs forced Mr. Nash to transport illicit substances via FedEx without his knowledge and consent. Combs lied and told Mr. Nash that he was sending vitamins. Mr. Nash was instructed to ship this package using the Bad Boy FedEx account. FedEx as well as the police called Mr. Nash to question him about the package, which to his surprise apparently contained illicit substances. Combs told Mr. Nash not to answer any questions and that he would handle it. Mr. Nash did not hear from anyone else regarding this incident.

102. Another example of this was when Combs' album Last Train to Paris was underperforming and Combs attempted to hand Mr. Nash cash directing him to purchase multiple copies of the album. Mr. Nash recognized this as improper, but Combs attempted to manipulate and coerce Mr. Nash into performing the task. On this occasion, Mr. Nash was able to say no to Combs but was terrified at the consequences it would have.

103. On multiple occasions, Combs would say that he didn't care about the Feds. Insinuating that he was above the law and untouchable. This only added to Mr. Nash's fear of Combs.

104. On two occasions, Defendants' employees ordered Mr. Nash to clean up "freak off" rooms where Combs had notorious coerced sexual encounters with others. Mr. Nash was ordered to clean up after one of these incidents occurred at the L'Ermitage Hotel in Beverly Hills, California. Mr. Nash was told by one of Defendants' employees not to talk about these incidents.

105. Combs constantly requested that Mr. Nash and Ms. Ventura convince female friends to come over. He would then make inappropriate comments and/or attempt to have sexual encounters with some of these friends. It got to the point that Mr. Nash and Ms. Ventura would attempt to hide their female friends from Combs. Mr. Nash was afraid of what Combs could and would do to his female friends if he was introduced to them.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

106. Mr. Nash tried to leave Defendants' employment for a brief period in approximately 2011. However, Defendants' employees exerted undue pressure and coercion onto Mr. Nash and told Mr. Nash he would not be able to find a job in the industry if Mr. Nash was not on good terms with Combs. Mr. Nash was still very afraid of Combs and what he could do to him physically, as well as reputationally, and agreed to work for Combs and the other Defendants out of fear.

107. Mr. Nash feared Combs' power and influence in the entertainment industry would cause irreparable harm to his career and future. Mr. Nash was terrified his reputation would be ruined if he did not continue to work for Combs despite his wishes not to return. Mr. Nash still fears his reputation and career opportunities will be impacted by his work with Combs and now speaking out against him.

**E. Mr. Nash Lived and Continues to Live in Fear of Combs, Even After Leaving Defendants' Employment.**

108. Combs' control over and manipulation of Mr. Nash continued even after Mr. Nash stopped working for Defendants in 2018.

109. Even after his employment ended, Mr. Nash was forced to remain in contact with Combs whenever Combs requested because he was terrified both for his safety and his reputation in the industry due to Combs' outsized power and influence.

110. Even after his employment ended, Mr. Nash was forced to remain civil and in contact with Combs because he was terrified of what Combs and Defendants could and would do to him and to his close friends, including Ms. Ventura. If Mr. Nash heard from others that Combs was talking negatively about him or Ms. Ventura, or that Combs was having a meltdown and becoming angry, Mr. Nash would call Combs to keep the peace and ensure things didn't escalate.

111. Mr. Nash knew many former employees of Defendants who were "blackballed" or abused by Combs and were unable to find employment. This was and still is a very real fear for Mr. Nash.

112. Combs' associates and other employee, including his security guards, carried guns. Mr. Nash knew Combs had a gun in Combs' car. Employees and people around discussed and knew that there were guns and weapons around. The guns and weapons furthered Mr. Nash's

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

reasonable belief that he could and would be harmed if he spoke out against or sought justice against Combs.

113. Based on Combs' threats over the years and the continued contact and actions of Defendants after his employment, Mr. Nash reasonably believed and still believes that if he ever spoke out or sought justice for the violence and abuse he endured from Combs, then he would pay for it with his well-being, career, and likely his life.

114. Combs repeatedly threatened Mr. Nash. Even after Mr. Nash escaped his employment, Combs made comments about Mr. Nash having to talk to him when he wanted because he was "letting him live." Combs would try to convince Mr. Nash to bring Ms. Ventura to him by using a lot of the same harassing and threatening tactics he had used on him and Ms. Ventura in the years prior.

115. Mr. Nash has now physically escaped Combs since he has been locked up, but the harm that the assaults, sexual abuse, constant threats, and manipulation Combs caused him to experience, for over a decade, still haunts him and will forever haunt him. Mr. Nash is still living in fear that Combs, through Defendants and his agents, will harm him.

116. Mr. Nash did not feel safe to come forward about his abuse even after being subpoenaed to testify in Combs' criminal trial where Combs was convicted and could be sentenced to prison for many years. Under a subpoena Mr. Nash reluctantly testified against Combs on May 28, 2025 and May 29, 2025. After Mr. Nash received a subpoena to testify he had a nervous breakdown because he was so scared to talk about what he had experienced and witnessed. This was years after Mr. Nash's employment had ended.

117. Despite Combs being in federal custody, Mr. Nash still lives in a constant state of fear and anxiety. He fears Combs, Defendants, or their associates will retaliate against him and based on Combs' history and reputation, this is still a very real and legitimate fear.

118. Mr. Nash was terrified to testify in Combs' criminal trial and would have been too afraid to speak out if he had not been forced to do so. It was only under a court order that Mr. Nash testified about *some* of the abuse he experienced by Combs.

119. During Mr. Nash's employment with Combs and Defendants, Combs showed Mr.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

Nash what he was capable of —which includes harming others physically and reputationally—and this continues to scare him. Even though Combs is currently incarcerated, he is still a powerful man. Mr. Nash knows that he still has people on the outside that are very capable and willing to do his bidding. He also fears for the day that Combs is released.

120. Even after Mr. Nash stopped working for Defendants, Combs continued to coerce Mr. Nash into silence. Combs continued to use Mr. Nash to keep tabs on Ms. Ventura. When Combs was angry with Mr. Nash and/or Ms. Ventura, he would tell them "I'm letting y'all live, the most you can do is get her to at least talk to me", "come by and see me so we can talk." Mr. Nash and Ms. Ventura took these comments as threats on their lives, even after neither one of them worked for Combs or Defendants. Mr. Nash reasonably believed that at any moment, including up to the present, Combs could be set off and either harm him, himself or hire/instruct others to do it. He continues to fear for his safety as he continues to speak out through this lawsuit to seek justice.

121. In 2019, Combs found out that Ms. Ventura was considering helping other victims of domestic violence; he called Mr. Nash to pressure him into convincing Ms. Ventura into not going through with it. He used threats to Mr. Nash such as, "I thought we was good." Again, Mr. Nash took these statements and calls as threats and based on Combs' history Mr. Nash was afraid.

122. Mr. Nash continues to require intensive medical and psychological care to manage the harm caused by Defendants and the trauma he lived through as a direct and proximate result of Defendants' conduct.

**JOINT AND SEVERAL LIABILITY**

123. "Joint and several liability 'applies when there has been a judgment against multiple defendants."[1] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.[2]

124. Federal law allows an injured party to sue a tortfeasor for the full amount of damages

---

[1] *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220–21 (1994).

[2] See 735 ILCS 5/2-1117; see Restatement (Second) of Torts § 875 (1977); *Honeycutt v. United States*, 137 S. Ct. 1626 (2017).

for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his portion of fault and even if the concurrent negligence of another contributed to the incident. [3]

125. Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of his injuries and damages alleged herein.

**EQUITABLE TOLLING**

126. To the extent defendants assert an affirmative defense of limitations for some of the claims, Mr. Nash invokes the equitable tolling and equitable estoppel doctrines. Statute of limitations may be tolled due to fear, especially when the fear is connected to coercion, duress, or intimidation that prevents a plaintiff from filing a timely claim. Equitable estoppel can apply when a defendant's threats of violence or intimidation prevent a plaintiff from filing a claim within the statute of limitations. Mr. Nash was under the coercion and control of Combs starting in 2008 and continuing even after his employment ended in 2018.

127. After Mr. Nash stopped working for Defendants, Combs would call Mr. Nash and make threats to him and Ms. Ventura. He would say things like "I'm just letting y'all live, the most you can do is get her to talk to me." Mr. Nash knew this was a threat and based on Combs' connections and violent history, Mr. Nash took these threats seriously. Combs would pass threats through Mr. Nash to Ms. Ventura all the way through 2022. In 2019 Combs got so angry with Mr. Nash that he indicated to him that he was having him and Mr. Ventura followed and that he knew where they were.

128. Mr. Nash is still terrified of Combs and the rest of the Defendants. To this day, he still wakes up in the middle of the night, heart racing, and fearful of Defendants.

129. Mr. Nash is still afraid of Combs and if not for being subpoenaed and forced to testify in Combs' criminal trial, Mr. Nash likely would have never come forward because of the fear he has for his safety. Because of Combs' threats and violence toward Mr. Nash and others and Combs' harassing behavior even after his employment ended Mr. Nash was and still is terrified for

[3] *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) (citations omitted); *Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).



SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

his life. This fear, due to no fault of his own, prevented Mr. Nash from pursuing his legal remedies including but not limited to the filing of a lawsuit. Mr. Nash's claims are timely and do not result in prejudice to Defendants.

## CAUSES OF ACTION

### First Cause of Action
### Human Trafficking California Civil Code § 52.5
### (By Plaintiff Against All Defendants)

130. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

131. Plaintiff is victim of human trafficking as defined in Cal. Penal Code § 236.1(a).

132. From approximately 2008 to 2018, Defendants deprived Plaintiff of personal liberty by controlling Plaintiffs personal life, career, and forcing Plaintiff to follow orders, engage in illegal activities, perform acts against his will, and remain in Defendants' employ:

a. Physically and sexually assaulting Plaintiff and others in front of Plaintiff repeatedly;

b. Threatening to cause physical harm to Plaintiff and Plaintiff's family and friends;

c. Threatening to damage Plaintiff's reputation in the entertainment industry;

d. Threatening to ruin Plaintiff's ability to find another job in the entertainment industry;

e. Subjecting Plaintiff to psychological manipulation by harassing Plaintiff, making derogatory comments directed at Plaintiff, and employing tactics to make Plaintiff feel isolated and under Defendants' control;

f. Constantly monitoring Plaintiff's location and individuals Plaintiff was spending time with; and

g. Finding and tracking down Plaintiff when Plaintiff tried to exit Defendants' employment or run away from Defendants.

h. Using these threats and coercion to force Plaintiff to engage in illegal acts and to perform acts against his will.

133. Plaintiff lived in a constant state of fear that if he did leave Defendants' employment

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

or did not follow Defendants' orders that Defendants would retaliate through physical violence, sexual assault, sexual harassment and degradation, and/or ruining Plaintiff's reputation and ability to find employment in the entertainment industry.

134. Plaintiff attempted to leave Defendants' employment but Defendants' threats of violence, reputational damage, and retaliation, forced Plaintiff to return against his will.

135. Plaintiff attempted to run away from Defendant Combs on multiple occasions, and Defendant Combs and/or his agents tracked Plaintiff down and forced Plaintiff to return.

136. Defendants intended to obtain the Plaintiff's forced labor and services by employing the tactics described above to deprive Plaintiff of his personal liberty and violate his personal liberty.

137. Even after Plaintiff's employment ended in 2018, Defendants continued to use threats to deprive Plaintiff of his liberty and force Plaintiff to continue to do Defendants' bidding. Defendants' threats caused significant duress and forced Plaintiff into hiding for days at a time on several occasions.

138. Plaintiff would have brought the action sooner had he not been in fear of his life and experiencing significant duress caused by Defendants' threats of harm and physical violence. In fact, Plaintiff is still fearful of Defendants and never felt somewhat free of Defendants until Combs was arrested and taken into federal custody in September 2024.

139. As a proximate and direct result of Defendants' conduct, Plaintiff suffered substantial physical and psychological injuries and other damages.

140. Under California Civil Code § 52.5, Plaintiff is entitled to recover actual damages, compensatory damages, punitive damages, injunctive relief, attorneys' fees and costs, any combination of those, or any other appropriate relief.

**Second Cause of Action**
**Assault**
**(By Plaintiff Against All Defendants)**

141. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

142. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

143. At all times relevant times, Defendants acted to and intended to cause harmful and offensive contact with Plaintiff's body. Defendants knew or should have known that such conduct would cause Plaintiff to reasonably apprehend an imminent harmful or offensive contact.

144. Defendants intentionally caused Plaintiff to reasonably apprehend an imminent harmful or offensive contact, including but not limited to Defendants making threats of physical violence to Plaintiff's person, Combs approaching Plaintiff with his penis exposed, and Combs making sexually suggestive comments, body movements, or gestures leading Plaintiff to believe Combs would sexually assault him. A reasonable person in Plaintiff's situation would have apprehended an imminent harmful or offensive contact.

145. Plaintiff did not consent to Defendants' conduct described herein. Plaintiff tried to escape and tried to get away repeatedly. Any reasonable person would have known that Plaintiff did not consent to Defendants' actions during the subject incidents.

146. As a direct, proximate and legal result of Defendants' actions described above, Plaintiff was injured in his health, strength and activity, sustaining physical, mental and nervous pain and suffering, trauma, and severe shock to his health and person, all to his general damages in a sum which will be shown according to proof.

147. As a direct, proximate and legal result of Defendants' actions described above , Plaintiff was injured and will require extensive medical and psychological care. As a result, Plaintiff has suffered economic damages in an amount to be proven at trial.

148. As a direct, proximate and legal result of Defendants' actions described above, Plaintiff required, requires and will require medical care, medical treatment, life care, and other incidental expenses and will likely incur additional like expenses in the future, all in amounts presently unknown to him.

149. In committing the wrongful and egregious acts described herein, Defendants acted with malice, oppression and fraud, justifying an award of punitive damages against all Defendants.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**Third Cause of Action**
**Battery**
**(By Plaintiff Against All Defendants)**

150. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

151. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

152. At all times relevant and during repeated instances of unwanted contact described above that is the basis of this Action, Defendants acted and intended to cause harmful and offensive contact with Plaintiff's body and did indeed make such harmful and offensive contact with Plaintiff's body repeatedly from 2008 to 2018 when Combs forced Mr. Nash to touch Combs' penis, pressed his penis against Mr. Nash, gyrated, and grinded on Mr. Nash's genital area, pinched Mr. Nash's nipple, grabbed Mr. Nash's butt, strangled Mr. Nash, and slapped Mr. Nash.

153. A reasonable person would believe that the harmful and offensive touching of Plaintiff's body without his consent by Defendant Combs was indeed "harmful and offensive." Plaintiff reasonably believed that the subject touching was harmful and offensive and a reasonable person in Plaintiff's situation would have been offended by the touching.

154. Plaintiff did not consent to the harmful or offensive touching described herein. Plaintiff tried to escape, tried to get away, moved Defendant's hand, pushed Defendant away, and said "stop." Any reasonable person would have known that Plaintiff did not consent to any touching by Defendant Combs at the time of the subject incidents.

155. As a direct, proximate and legal result of the harmful and offensive touching by Defendant Comb, described above, Plaintiff was injured in his health, strength and activity, sustaining physical, mental and nervous pain and suffering, trauma, and severe shock to his health and person, all to his general damages in a sum which will be shown according to proof.

156. As a direct, proximate and legal result of the harmful and offensive touching by Defendant Combs, Plaintiff was injured and will require extensive medical and psychological care. As a result, Plaintiff has suffered economic damages in an amount to be proven at trial.

157. As a direct, proximate and legal result of the harmful and offensive touching by

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

Defendant Combs, Plaintiff required, requires and will require medical care, medical treatment, life care, and other incidental expenses and will likely incur additional like expenses in the future, all in amounts presently unknown to him.

158. In committing the wrongful and egregious acts described herein, Defendants acted with malice, oppression and fraud, justifying an award of punitive damages against all Defendants.

**Fourth Cause of Action**
**Sexual Battery**
**(By Plaintiff Against All Defendants)**

159. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

160. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

161. At all times relevant and during the unwanted contact described above that is the basis of this Action, Defendants acted to and intended to cause harmful and offensive contact with Plaintiff's hand and Defendant Comb's penis and Plaintiff's butt, groin, and nipple.

162. Defendants did indeed make such harmful and offensive contact with Plaintiff's body repeatedly from 2008 to 2018 when Defendant Combs forced Mr. Nash to touch his penis, pressed his penis against Mr. Nash, gyrated and grinded on Mr. Nash's groin, pinched Mr. Nash's nipple, and grabbed Mr. Nash's butt.

163. Plaintiff did not consent to the harmful or offensive touching described herein. Plaintiff tried to escape, tried to get away, moved Defendant's hand, pushed Defendant away, and said "stop." Any reasonable person would have known that Plaintiff did not consent to any touching by Defendant Combs of Plaintiff at the time of the subject incidents.

164. As a direct, proximate and legal result of the harmful and offensive touching of Plaintiff by Defendant Combs, described above, Plaintiff was injured in his health, strength and activity, sustaining physical, mental and nervous pain and suffering, and severe shock to his health and person, all to his general damages in a sum which will be shown according to proof.

165. As a direct, proximate and legal result of the harmful and offensive touching of Plaintiff by Defendant Combs, described above, Plaintiff has suffered economic damages in an

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

amount to be proven at trial.

166. As a direct, proximate and legal result of the harmful and offensive touching of Plaintiff, described above, Plaintiff required, requires, and will require medical care, medical treatment, life care, and other incidental expenses and will likely incur additional like expenses in the future, all in amounts presently unknown to him.

167. In committing the wrongful and egregious acts described herein, Defendants acted with malice, oppression and fraud, justifying an award of punitive damages against all Defendants.

**Fifth Cause of Action**
**Negligence**
**(By Plaintiff Against All Defendants)**

168. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

169. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

170. At all times relevant, Defendants had a duty to use reasonable care to prevent harm to others, including Plaintiff, and to act as a reasonably careful person would have acted in Defendants' situation at the time of the subject incidents.

171. At all times relevant and during the sexual assaults, physical assaults, manipulation and control described above and that are the basis of this Action, Defendants failed to use any care and failed to use reasonable care to prevent harm to Plaintiff.

172. Plaintiff did not consent to the harmful or offensive touching described herein. Plaintiff tried to escape, tried to get away, moved Defendant's hand, pushed Defendant away, and told him to stop.

173. Any reasonable person would have known that Plaintiff did not consent to any touching by Defendant Combs. A reasonably careful person would not have touched Plaintiff in the manners described above. A reasonably careful person would have listened when Plaintiff said "no" and "stop" if they were in Defendants' situation at the time of the incident. Defendant Combs and all Defendants completely failed to act as a reasonably careful person when Combs repeatedly sexually assaulted Plaintiff multiple times over a decade.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

174. Any reasonable person would not have physically abused, verbally harassed, manipulated, and controlled Plaintiff. A reasonable person would have ceased these behaviors when Plaintiff asked Defendants to stop or tried to run away.

175. Defendants breached their duty of care to Plaintiff and were negligent when they failed to use reasonable care and failed to act as a reasonable person or entity would have acted in their situation at the time of the incidents as described above.

176. In committing the wrongful and egregious acts described above, Defendants showed a lack of any care and an extreme departure from what a reasonably careful person would do in the same situation to prevent harm to oneself or to others. Thus, Defendants were grossly negligent at the time of the subject incidents.

177. Defendants' gross negligence at the time of the subject incidents described herein was a substantial factor in causing harm to Plaintiff as described above and below.

178. Defendants' conduct is *per se* negligent because their sexual and physical assault, sexual harassment, threats of serious harm, humiliation, psychological manipulation, and control over Plaintiff's career and life, violated the following laws:

a. Cal. Penal Code § 242

b. Cal. Penal Code § 243.4

c. Cal. Penal Code § 236.1(a)

d. Trafficking Victims Protection Act, 18 U.S.C. § 1589(a)

e. Gender Violence under Cal. Civil Code §52.4

f. Sexual Orientation Violence under Cal. Civil Code §52.4

179. The actions of Defendants that caused Plaintiff's injuries are the within the conduct that these statutes were designed to prevent.

180. As a direct, proximate and legal result of the negligence and carelessness of the Defendants, and each of them, described above, Plaintiff was injured in his health, strength and activity, sustaining physical, mental and nervous pain and suffering, and severe shock to his health and person, all to his general damages in a sum which will be shown according to proof.

181. As a direct, proximate and legal result of the negligence and carelessness of the

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

Defendants, and each of them, described above, Plaintiff was injured and may be disabled in the future and thereby prevented from attending to the duties of his usual occupation. As a result, Plaintiff has suffered economic damages in an amount to be proven at trial.

182. As a direct, proximate and legal result of the negligence and carelessness of the Defendants, and each of them, Plaintiff required, requires, and will require medical care, medical treatment, life care, and other incidental expenses and will likely incur additional like expenses in the future, all in amounts presently unknown to him.

183. In committing the wrongful and egregious acts described herein, Defendants acted with malice, oppression and fraud, justifying an award of punitive damages against Defendants.

**Sixth Cause of Action**
**Intentional Infliction of Emotional Distress**
**(By Plaintiff Against All Defendants)**

184. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

185. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

186. During the subject sexual and physical assault, sexual harassment, verbal harassment, control, and manipulation of Plaintiff by Defendants, Defendants' conduct was extreme and outrageous conduct that Defendants' intended would cause Plaintiff severe emotional distress or reckless disregard of the probability of causing, emotional distress.

187. The acts of Defendants were intentional, extreme, and so outrageous it exceeds all bounds of that usually tolerated in a civilized community.

188. At all relevant times, Defendants intended to cause Plaintiff emotional distress.

189. As a direct, proximate and legal result of the extreme and outrageous wrongful conduct of the Defendants, and each of them, described above, Plaintiff suffered severe emotional distress.

190. Defendant's conduct was a substantial factor in causing Plaintiff's severe emotional distress.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

191. In committing the extreme and outrageous wrongful acts described herein, Defendants acted with malice, oppression and fraud, justifying an award of punitive damages against Defendants.

**Seventh Cause of Action**
**Negligent Infliction of Emotional Distress**
**(By Plaintiff Against All Defendants)**

192. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

193. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

194. Defendants negligently, carelessly, recklessly, and wantonly caused physical and emotional injury to Plaintiff amongst other things by committing sexually battery, physical assault, harassment against Plaintiff and by exerting control over Plaintiff's life and career by threatening Plaintiff's physical safety and reputation in the entertainment industry.

195. Defendants caused Plaintiff to suffer and continued to suffer serious emotional distress, and the actions of these Defendants were a substantial factor in causing Plaintiff's serious emotional distress. The emotional distress caused to Plaintiff was such that no reasonable person, normally constituted, would be unable to adequately cope with the mental stress.

196. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer pain and suffering, extreme and severe mental anguish, and emotional distress which has caused him to suffer and continues to suffer from anxiety, depression, sleepless nights, humiliation, shock, worry, fright, anguish, mental trauma as well as sustain severe, serious and permanent injuries to his person, all to his damages in a sum to be shown according to proof. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

197. As a direct and legal and proximate result of said actions by Defendants, Plaintiff has been under the care of emotional health specialists and the like, to care for and treat him, and did and will incur medical expenses in the future for the ongoing emotional health care he requires as a result of Defendants' outrageous conduct.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**Eighth Cause of Action**
**False Imprisonment**
**(By Plaintiff Against All Defendants)**

198. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

199. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

200. While Plaintiff was employed by Defendants from approximately 2008 to 2018, Defendant used violence, sexual assaults, threats of harm to safety, threats of damage to reputation, psychological abuse and manipulation to control the Plaintiff, thereby depriving Plaintiff of his freedom of movement by use of physical force and unreasonable duress.

201. Plaintiff tried to leave Defendants' presence and employment on multiple occasions described above. Each time Plaintiff fled, Defendants and/or Defendants' agents found Plaintiff and/or threatened Plaintiff if he did not return.

202. Even after his employment, Defendant Combs constantly monitored Plaintiff's location and would constantly call Plaintiff until Plaintiff revealed his location to Defendants.

203. Defendant Combs restricted Plaintiffs freedom of movement by compelling him to be present in certain places and perform tasks according to Defendants' wishes.

204. Plaintiff was afraid to leave Defendants' employment for a decade because of fears of Defendants' reprisals. The restraint compelled Plaintiff to stay employed by and under the control of Defendant for an appreciable amount of time.

205. Defendants' security team prevented Plaintiff from leaving his home when he wished to do so.

206. At the time of the subject incidents from approximately 2008 to 2018, Plaintiff did not consent to Defendants depriving him of his freedom of movement.

207. As a direct and proximate result of Defendants' restraining Plaintiff and depriving him of his freedom of movement at the time of the subject incidents, Plaintiff was actually hurt, harmed, as well as psychological, mental, and emotional distress, including, but not limited to grief, fear, humiliation, shame, anxiety, depressive symptoms, physical distress, and sadness. Plaintiff

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

has incurred, is currently incurring and will continue to incur expenses for mental, psychological, psychiatric, and medical care due to the assault, according to proof at trial, but in no event less than the minimum jurisdictional amount of this Court.

208. As a direct, proximate and legal result of the restraint and confinement of Plaintiff by Defendants, and each of them, described above, Plaintiff was injured in his health, strength and activity, sustaining physical, mental and nervous pain and suffering, and severe shock to his health and person, all to his general damages in a sum which will be shown according to proof.

209. As a direct, proximate, and legal result of the restraint and confinement of Plaintiff by Defendants, and each of them, described above, Plaintiff was injured and may be disabled in the future and thereby prevented from attending to the duties of usual occupation. As a result, Plaintiff has suffered economic damages in an amount to be proven at trial.

210. As a direct, proximate, and legal result of the restraint and confinement of Plaintiff by Defendants, and each of them, Plaintiff required, requires, and will require medical care, medical treatment, life care, and other incidental expenses and will likely incur additional like expenses in the future.

**Ninth Cause of Action**
**Gender Violence under Cal. Civil Code §52.4**
**(By Plaintiff Against All Defendants)**

211. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

212. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

213. Cal. Civ. Code § 52.4(c) defines "gender violence" as: (1) one or more act that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction. (2) A physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal charges, complaints, charges, prosecution, or conviction.

214. As alleged herein above, each Defendant acted to aid, abet, and/or conspire with the

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

other to violate Cal. Civ. Code § 52.4. The Defendants committed acts of gender violence upon the Plaintiff through the use, attempted use, or threatened use of physical force against his person, committed at least in part based on Plaintiff's gender.

215. As alleged hereinabove, each Defendant acted to aid, abet, and/or conspire with the other to violate Cal. Civ. Code § 52.4 so that they engaged in a physical intrusion or physical invasion of a sexual nature under coercive conditions.

216. As a direct and proximate result of Defendants' outrageous and unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, all in an amount exceeding the jurisdictional minimum of the Superior Court according to proof at trial.

217. As a direct and proximate result of Defendants' outrageous and unlawful conduct as alleged hereinabove, Plaintiff has suffered economic harm and other consequential damages, all in an amount according to proof at trial.

218. The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, each Defendant acted with conscious disregard of Plaintiff's rights and feelings. Each Defendant also acted with the knowledge of or with reckless disregard for the fact that his or her conduct was certain to cause injury and/or humiliation to the Plaintiff. Plaintiff is further informed and believes that each Defendant intended to cause fear, physical injury and/or pain and suffering to the Plaintiff. By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof at trial.

219. Plaintiff has incurred, and will continue to incur, attorneys' fees in the prosecution of this action and therefore demands such reasonable attorneys' fees and costs as set by the Court.

**Tenth Cause of Action**
**Sexual Orientation Violence under Cal. Civil Code §52.4**
**(By Plaintiff Against All Defendants)**

220. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

221. This cause of action arose out of Defendants' conduct of trafficking and subjecting

the Plaintiff to forced labor in violation of Civil Code § 52.5.

222. Cal. Civ. Code § 52.45(c) defines "sexual orientation violence" as "one or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the sexual orientation of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction."

223. Defendants' violated Cal. Penal Code § 242, § 243.4, and § 236.1(a).

224. As alleged herein above, each Defendant acted to aid, abet, and/or conspire with the other to violate Cal. Civ. Code § 52.45. The Defendants committed acts of sexual orientation violence upon the Plaintiff through the use, attempted use, or threatened use of physical force against his person, committed at least in part based on Plaintiff's sexual orientation.

225. As alleged hereinabove, each Defendant acted to aid, abet, and/or conspire with the other to violate Cal. Civ. Code § 52.4 so that they engaged in a physical intrusion or physical invasion of a sexual nature under coercive conditions.

226. As a direct and proximate result of Defendants' outrageous and unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, all in an amount exceeding the jurisdictional minimum of the Superior Court according to proof at trial.

227. As a direct and proximate result of Defendants' outrageous and unlawful conduct as alleged hereinabove, Plaintiff has suffered economic harm and other consequential damages, all in an amount according to proof at trial.

228. The aforementioned conduct by Defendants was willful, wanton, and malicious. At all relevant times, each Defendant acted with conscious disregard of Plaintiff's rights and feelings. Each Defendant also acted with the knowledge of or with reckless disregard for the fact that his or her conduct was certain to cause injury and/or humiliation to the Plaintiff. Plaintiff is further informed and believes that each Defendant intended to cause fear, physical injury and/or pain and suffering to the Plaintiff. By virtue of the foregoing, the Plaintiff is entitled to recover punitive and exemplary damages from Defendants according to proof at trial.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

229. Plaintiff has incurred, and will continue to incur, attorneys' fees in the prosecution of this action and therefore demands such reasonable attorneys' fees and costs as set by the Court.

**Eleventh Cause of Action**
**Constructive Discharge**
**(By Plaintiff Against All Defendants)**

230. Plaintiff hereby incorporates by reference all prior and subsequent allegations as if fully set forth herein.

231. This cause of action arose out of Defendants' conduct of trafficking and subjecting the Plaintiff to forced labor in violation of Civil Code § 52.5.

232. Plaintiff was employed by the Defendants.

233. From approximately 2008 to 2018, Defendants subjected Plaintiff to sexual and physical assaults, threats to Plaintiff's safety and reputation, verbal and sexual harassment, psychological manipulation, control over Plaintiff's personal life and career, and coercing Plaintiff to perform tasks against his will.

234. Defendants intentionally created these working conditions.

235. These working conditions were so intolerable that a reasonable person in the Plaintiff's position would have no reasonable alternative except to resign.

236. Plaintiff resigned because he could not take it anymore due to these working conditions.

237. Plaintiff is harmed.

238. These working conditions were a substantial factor in causing Plaintiff's harm.

239. Plaintiff could not complain about these conditions out of fear for his life and safety, as explained above.

240. Plaintiff is informed and believes, and based thereon alleges, that the outrageous conduct of Defendants described above was done with malice, fraud, and oppression, and with the conscious disregard of his rights and with the intent, design, and purpose of injuring him. By reason thereof, Plaintiff is entitled to punitive or exemplary damages from Defendants in an amount according to proof at trial.

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against all Defendants, jointly and severally, as follows:

1. For general and compensatory damages in an amount to be proven at the time of trial;
2. For non-economic damages, including, but not limited to stress, anxiety, emotional distress, grief, mental anguish, pain, suffering;
3. For prejudgment and pretrial interest according to proof;
4. For punitive damages against Defendants as to Causes of to which they apply;
5. For costs of suit herein incurred; and
6. For such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Notice is hereby given that Plaintiff hereby demands trial by jury in the above-captioned matter.

Dated: September 23, 2025 SINGLETON SCHREIBER, LLP

By: Katie S. Llamas

Brett Schreiber, Esq.
Meagan Verschueren, Esq.
Katie Llamas, Esq.
Kristina Aiad-Toss, Esq.
Attorneys for Plaintiff

SINGLETON SCHREIBER, LLP
591 Camino de la Reina, Suite 1025 | San Diego, CA 92108
www.singletonschreiber.com